# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

GORDON GULLIFORD, SR.,       )
                                    )
              Plaintiff,    )
v.                              )      CAUSE NO.: 4:15-CV-19-PRC
                                    )
SCHILLI TRANSPORTATION    )
SERVICES, INC.,              )
                                    )
             Defendant.    )

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## OPINION AND ORDER FOR ENTRY OF FINAL JUDGMENT

This is an action by Plaintiff Gordon Gulliford, Sr. against Defendant Schilli Transportation

Services, Inc. ("STS"), brought under the Americans with Disabilities Act and the Family Medical

Leave Act. A simultaneous jury trial and bench trial began in this case on February 21, 2017, and

concluded on February 23, 2017. Four of the five counts were determined by the jury; the Court

submitted a verdict form to the jury on the Americans with Disabilities Act retaliation claim for an

advisory verdict. *See* Fed. R. Civ. P. 39(c). The jury returned verdicts in favor of Defendant STS on

all claims, including on the ADA retaliation claim (advisory verdict).

After hearing all of the evidence, taking into account the credibility of the witnesses, and

considering the parties' pleadings and the exhibits admitted into evidence, the Court hereby makes

its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and

orders entry of final judgment on the claim of ADA retaliation.

## PROCEDURAL BACKGROUND

On March 6, 2015, Plaintiff Gordon Gulliford, Sr. filed a Complaint against Defendant STS,

alleging claims of employment discrimination. In Count I, brought under the Americans with

Disabilities Act (ADA), Gulliford alleges that STS took adverse employment actions against him

based on his disability by terminating his employment. Count II alleges retaliation under the ADA when STS terminated Gulliford's employment after he requested an accommodation and when STS ceased employing him as an independent contractor. In Count III, Gulliford alleges a failure to accommodate under the ADA on the basis that he requested an accommodation that was denied. Count IV alleges a violation of the Family Medical Leave Act (FMLA) when Gulliford's employment was terminated allegedly in retaliation for requesting FMLA leave and/or taking FMLA leave. In Count V, Gulliford alleges age discrimination under the Age Discrimination in Employment Act (ADEA) in the termination of his employment.

On April 28, 2015, STS filed an Answer, and on September 14, 2016, STS filed a Motion for Summary Judgment.

On January 5, 2017, the Court granted in part and denied in part the Motion for Summary Judgment, granting summary judgment in favor of STS on Gulliford's claims of (1) disability retaliation under the ADA based on his April 3, 2014 EEOC charge and (2) age discrimination under the ADEA. The following claims survived for trial: (1) disability discrimination under the ADA; (2) disability retaliation under the ADA based on his request for accommodations; (3) failure to accommodate under the ADA; (4) FMLA interference; and (5) FMLA retaliation.

On January 31, 2017, in ruling on Defendant's Motion in Limine, the Court ordered:

> Plaintiff Gulliford may introduce evidence or argument that on or about October 8, 2013, he requested part-time employment and that Defendant STS denied the request. Plaintiff Gulliford, however, is not permitted to assert at trial a reasonable accommodation claim or retaliation claim based upon his October 8, 2013 request for part-time employment.

(ECF 69, p. 4).

This matter proceeded to a jury trial on February 21, 2017, through February 23, 2017, on the claims of disability discrimination under the ADA, failure to accommodate under the ADA, FMLA interference, and FMLA retaliation. At the same time, the claim of disability retaliation under the ADA based on Gulliford's request for accommodations was heard by the Court. On February 23, 2017, the jury returned a verdict in favor of STS on all five claims; the verdict on the ADA retaliation claim was an advisory verdict to assist the Court in its ruling.

The parties filed written notices of consent for the Magistrate Judge to conduct any and all proceedings including trial. Accordingly, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## STANDARD OF PROOF

This matter being a civil case, Plaintiff Gordon Gulliford, Sr. has the burden to prove his claims, alleged in his Complaint, by a preponderance of the evidence. Defendant STS has the burden to prove its affirmative defenses by a preponderance of the evidence.

## FINDINGS OF FACT

1.      The findings of fact herein are based upon the trial evidence. Where factual conflicts in the evidence exist, the findings herein are the facts the Court has determined to be more probably true than not true after resolving the factual conflicts.

2.      Thomas Schilli is the part-owner and president of Schilli Transportation Services, Inc. (STS) and the owner or part-owner of several related "Schilli" companies.

3.      Plaintiff Gordon Gulliford, Sr. began his employment with STS in 1994. He left STS in 1999 and returned in 2002, when he was hired by Thomas Schilli as Manager of Special Projects and Corporate Taxes. Gulliford held that position until his termination on October 28, 2013.

4.      Gulliford had a history of heart health problems.

5.     In August 2013, Gulliford received notice that a heart was available for him to receive for a heart transplant.

6.     Gulliford requested, and STS granted, FMLA leave for the surgery and recovery.

7.     While Gulliford was on FMLA leave, Thomas Schilli himself was already on medical leave recovering from his own surgery. Schilli learned he would need surgery in May 2013; he returned from his own medical leave around Labor Day 2013.

8.     On September 12, 2013, Gulliford's doctor, Dr. Pitts, signed a "Certification of Health Care Provider for Employee's Serious Health Condition (FMLA)." He indicated that Gulliford was "recovering from surgery – unable to work." (Pl. Ex. 5). On page 3 of the form, question 6 asks: "Estimate the part-time or reduced work schedule the employee needs, if any." (Pl. Ex. 5). Dr. Pitts wrote in on the lines: " 8  hour(s) per day; one days per week from 9/16/13 through 12/31/13 ." (Pl. Ex. 5).

9.     Wanda Miller was the Human Resources Director of STS at the time. Gulliford and Wanda Miller testified that they spoke in mid-September 2013 and agreed that the form had been incorrectly filled out by Dr. Pitts in relation to question 6.

10.     On September 23, 2013, Gulliford obtained a corrected version of page 3 from his doctor. (Pl. Ex. 6; Def. Exs. C, E). The answer to question 6 now provides: " Zero  hour(s) per day; zero days per week from 9/16/13 through 12/31/13 ." (Def. Ex. C). Gulliford did not forward the corrected page to Wanda Miller until October 15, 2013. Once she received the page, Wanda Miller understood that Gulliford was not allowed to come back to work at all until the end of the year.

11.     Sometime in September 2013 or early October 2013, while Gulliford was on FMLA leave, Jason Fellmy, head of the STS Accounting Department, called Gulliford to ask about the location of certain documents STS needed to provide to its outside accounting firm Somerset CPAs,

P.C. ("Somerset"). Fellmy testified that he did not ask Gulliford to come to the office to find the documents. Gulliford did not testify that Fellmy asked him to come to the office.

12. Over the weekend of October 5-6, 2013, Gulliford went to the STS office, found the documents, and took them to Somerset in Indianapolis early the next week when he was in Indianapolis for a doctor appointment. Gulliford did not notify STS that he was going to the office.

13. Gulliford testified that he had called his doctor to ask if he could go into the office to get some materials that the CPA firm needed and that his doctor told him he could if he felt up to it but that he should not be carrying anything.

14. On Tuesday, October 8, 2013, Gulliford's physician signed a note on a prescription pad dated October 8, 2013, that provides: "[Patient] may return to work, part-time as long as he isn't doing heavy lifting and wears his mask." (Pl. Ex. 7).

15. That same week, Gulliford called Wanda Miller to report that he had worked 17.5 hours over Saturday, Sunday, and Monday in order to get the information to STS's CPA, Kevin O'Connell, at Somerset.

16. On October 10, 2013, Wanda Miller sent an email to Thomas Schilli, reporting that Gulliford had called to report that he worked 17.5 hours the previous Saturday, Sunday, and Monday, to get information together for O'Connell. Miller wrote, "I asked if he had a release and he said he didn't have time to get one yet, but told his doctor that he did work some and doctor told him as long as he felt like it it was okay." (Def. Ex. D). She further reported that Gulliford said that he was expecting to get a release to work four hours a day beginning on November 1, 2013. She further stated that she told Gulliford that she needed to see a release and that she would get back to him.

17.     There is no evidence in the record that Wanda Miller received the October 8, 2013 note from Gulliford's doctor allowing part-time work.

18.     At trial, Thomas Schilli testified that Gulliford was not cooperating with others when he worked that weekend in October 2013 while still on medical leave without a medical release.

19.     On October 22, 2013, Gulliford's physician released him to return to work full-time beginning on November 6, 2013. (Pl. Ex. 8). There is no evidence that this release was given to anyone at STS prior to October 28, 2013.

20.     On October 28, 2013, Thomas Schilli sent a letter to Gulliford terminating his employment. The letter provides, in relevant part: "We have examined the functions of the tax department and made the decision to eliminate the department. We have outsourced our tax department function to Somerset CPA, . . . ." (Def. Ex. F). The letter further provides: "Unfortunately, this results in the elimination of your position as an employee of Schilli Transportation Services, Inc. effective October 28, 2013." *Id.* The letter also provides: "There will be ongoing projects that we believe your expertise will be ideally suited to perform . . . . Please give consideration to partnering with us as an independent contractor at a rate of $30 per hour . . . ." *Id.*

21.     Wanda Miller testified that Thomas Schilli mentioned to her in mid-2013, or two to three months before the end of October 2013, that he was intending to close the Tax Department.

22.     Gulliford was still on FMLA leave for the heart transplant when his employment was terminated on October 28, 2013.

23.     At the time Gulliford had heart transplant surgery in August 2013 and at the time the Tax Department was closed in October 2013, Gulliford was not on the STS health plan, which was a self-insured plan. Rather, he had medical coverage through Medicare.

24.     At the time Gulliford had heart surgery in August 2013 and at the time of his termination on October 28, 2013, he was the only member of the Tax Department. However, when he started working for STS in 2002, he had two clerical employees under him in the Tax Department and continued to supervise one or two clerical employees until June 2013. In June 2013, the only other employee in the Tax Department—Rachel Harrigan—left for another company; she was not replaced. Harrigan's clerical duties were transferred to existing employees in the payables/receivables/payroll department under Beth Kemper and the accounting department under Jason Fellmy.

25.     At all times after 2002, Thomas Schilli was Gulliford's supervisor.

26.     Clerical employees were responsible for fuel tax returns, sales tax returns, paying property taxes, business personal property taxes, federal unemployment taxes, and other types of taxes, but not income taxes. Outside CPAs Ronald L. Cox of Cox & Co. and Kevin O'Connell of Somerset described this work in their respective testimony as in-house compliance work. Gulliford did not perform these functions.

27.     At the time of his termination, Gulliford's duties as Manager of Taxes and Special Projects was making sure all payroll taxes, IFTA taxes, sales tax, personal property taxes, and any tax that had to do with the Schilli companies were done properly. He was also in charge of special projects, such as preparing the year end tax analysis for all the companies. He also did special projects for Thomas Schilli personally. Yearly, he gathered documents for the outside CPA firm, Somerset, to do Thomas Schilli's personal taxes. Gulliford, or the Tax Department, filed state income tax returns for states other than Indiana.

28.     Gulliford testified that Somerset did audits and reviews for the Schilli companies, federal income taxes for most of the Schilli companies, and the State of Indiana income tax return.

Kevin O'Connell of Somerset testified that his role for the Schilli companies is to oversee the preparation of their tax returns and of their income tax returns, to provide advice when they get notices from government agencies regarding tax liability, and to provide advice regarding future taxes. Somerset also does assurance work for the Schilli companies, which entails reviewing the financial statement and all of the Schilli accounts. O'Connell testified that Somerset does not prepare sales tax returns, fuel tax returns, payroll, or unemployment tax returns for the Schilli companies because this compliance work is clerical and is handled in-house by the company. Up until 2012, in the income tax area, Somerset prepared the federal corporate returns and the State of Indiana returns for five of the Schilli companies. In 2013, Somerset also prepared the state returns other than Indiana for many of the large companies.

29. Ronald Cox's firm of Cox & Co. primarily does tax work for businesses. Ronald Cox does work for the Schilli companies. In 2013, Schilli Leasing, one of the Schilli companies, received a notice from the Indiana Department of Revenue regarding an adverse sales tax audit. Ronald Cox was contacted by Thomas Schilli in January 2013 to assist with the audit.

30. While Ronald Cox was assisting with the audit, Thomas Schilli asked Ronald Cox if he thought the Tax Department was a full-time position, and Ronald Cox testified that he responded that he thought it was a half-time position given that the outside CPAs do most of the income tax work. Cox told Schilli that he thought the half-time position would be for an accounting clerk or a skilled bookkeeper.

31. In February or March 2013, Thomas Schilli asked Ronald Cox about taking over all of the tax work and replacing Somerset. That did not ultimately occur.

32.     In the first half of 2013, Thomas Schilli was deciding to close the STS Tax Department. However, he learned in May 2013 that he was going to have major surgery in July 2013. He postponed the decision regarding the Tax Department until after his recovery.

33.     Thomas Schilli testified that he closed the Tax Department because he felt his companies would have better information and better results in managing taxes, tax flow, and tax preparation. Instead, Kevin O'Connell from Somerset visits the company once a month to plan the tax strategy with Thomas Schilli and the managers.

34.     After Thomas Schilli returned from his own medical leave in September 2013, while Gulliford was still on leave for his heart transplant, Wanda Miller discussed with Schilli that organizational changes or departmental changes can be made while someone is on FMLA leave and the FMLA would not necessarily preclude the decision to make the organizational change.

35.     STS eliminated expenses as a result of eliminating the Tax Department.

36.     After Gulliford's termination, Jason Fellmy took over the year-end analysis that had been previously performed by Gulliford. Both Fellmy and Gulliford testified that this work took only a few days.

37.     Stephanie Venderhere was hired by STS in September 2013 and was given certain tax-related clerical functions that had previously been performed by Kim Conley, who took over the duties of Rachel Harrigan when she left in June 2013. Both Conley and Harrigan had worked for Beth Kemper. Stephanie Vanderhere left STS in February 2014. In April 2014, Daniel Vat was hired to replace Vanderhere and was given the title of Administrative Assistant to the Business Manager.

38.     An organizational chart of the STS "Finance/Tax" structure, dated January 4, 2013, lists Gulliford as the "Tax Accountant Manager," working directly under Thomas Schilli. *See* (Pl. Ex. 10). The same organizational chart for a year later, after Gulliford's termination, dated February

4, 2014, does not list a Tax Department. The February 4, 2014 chart lists Stephanie Vanderhere as a "Staff Accountant/Tax Coordinator," working under Beth Kemper, who worked under Thomas Schilli. *Id.*

39.    On February 21, 2014, STS posted a job advertisement for a "Bookkeeper—Tax Preparer." (Pl. Ex. 9). The posting lists the responsibilities of the position as payroll tax filings weekly, monthly, quarterly, annually; sales tax filings; quarterly unemployment tax filings; 940 and 941; annual W2 filing; annual 1099 filings; and sales tax exemptions. (Pl. Ex. 9). The posting asks for an associate degree in accounting or finance with a "bachelor's degree preferred."

40.    Lou Wilkinson has been employed by STS for thirty years and has been a manager since 1988. He is a software developer and is the head of the Information Technology Department. He developed and maintains STS's computer software. Lou Wilkinson testified that STS is constantly changing its companies, departments, and responsibilities and gave examples of several departments that have gone through change. He testified that his own job and functions have changed over the years, including as a programmer, head of the programming department, controller, head of human resources, and vice president. Through all the changes, Lou Wilkinson maintained his employment. He testified that the changes are for efficiency and profitability and as a result of changing business conditions. He testified that the decisions are made by Thomas Schilli. Lou Wilkinson described Schilli as a "change agent."

41.    Thomas Schilli testified that he is constantly reorganizing his companies for efficiency and cost effectiveness.

42.    In approximately 2006 or 2007, Thomas Schilli called Gulliford his "6 million-dollar man." Schilli testified that he made the comment in jest during conversations that he and Gulliford had about their health issues to mean that Gulliford should get healthy. Gulliford testified that he

thought Schilli made the comment because Schilli was displeased was the amount of health expenses Gulliford was costing the company, which was self insured.

43. At the trial, Gulliford confirmed that, at his deposition prior to trial, Gulliford testified that he did not believe his heart condition or his request for leave had anything to do with the Tax Department closure.

## CONCLUSIONS OF LAW

Plaintiff Gordon Gulliford, Sr. claims that STS terminated his employment because he requested a reasonable accommodation for his disability. The Court acknowledges the jury's advisory ruling on this ADA retaliation claim in favor of Defendant STS. The determination was based on an analysis of the facts, all of which were within the realm of the jury's understanding. The jury's advisory verdict was reasonable. The Court also heard the evidence and finds, for the following reasons, that Gulliford has failed to prove by a preponderance of the evidence his claim of ADA retaliation based on his request for accommodations and that STS proved its affirmative defense of a legitimate business reason by a preponderance of the evidence.

The ADA prohibits an employer from retaliating against an employee for requesting an accommodation. 42 U.S.C. § 12203(a). To succeed on his retaliation claim, Gulliford must prove by a preponderance of the evidence that he requested an accommodation and that this request was the but-for cause of his termination. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, — U.S. —, —, 133 S. Ct. 2517, 2528 (2013). "[T]he ADA renders employers liable for employment decisions made 'because of' a person's disability, . . . [which] require[s] a showing of but-for causation." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 (2009)); *see also Silk v. Bd. of Trs.*, 795 F.3d 698, 705 (7th Cir. 2015). As noted in *Silk*, the 2008 amendments to the ADA change the "because of" language in § 12112(a), which

was at issue in *Serwatka*, to "on the basis of." *Silk*, 795 F.3d at 705. Thus, there is an open question in this circuit as to whether the new "on the basis of" langauge is also a "but for" standard. The court in *Silk* declined to decide the question. *Id.*; *see also Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 n.2 (7th Cir. 2015). In the post-trial briefs in this case, the parties do not address this issue directly, but both assert that but-for causation is required. The Court finds that there is no meaningful textual difference between "on the basis of" and the terms "because of." *See Gentry v. E.W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235-36 (4th Cir. 2016). Therefore, the Court continues to follow the holding of *Serwatka* that a retaliation claim under the ADA requires a showing of but-for causation.

First, the Court finds that Gulliford has proven by a preponderance of the evidence that he engaged in protected activity under the ADA when he requested the accommodation of medical leave to have heart transplant surgery in August 2013. *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814-15 (7th Cir. 2015) (noting that a statutorily protected activity includes seeking an accommodation (citing *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008)). STS granted Gulliford the accommodation by approving him FMLA leave. Although Gulliford also argues that he sought a reasonable accommodation of returning to work *part-time* in October 2013, *see* (Pl. Br. 3), the Court ruled in its Order on STS's Motion in Limine that Gulliford was precluded from asserting ADA retaliation based on requesting to return to work part-time in October 2013. Therefore, the only reasonable accommodation that forms the basis of the ADA retaliation claim is the request for FMLA medical leave for the heart transplant surgery, which includes returning to work following the leave.

Second, there is no dispute that STS terminated Gulliford's employment, as evidenced by the October 28, 2013 letter from Thomas Schilli, which provides that Gulliford's employment was

terminated as of that date. Thus, Gulliford has proven by a preponderance of the evidence that his employment was terminated, which was a materially adverse employment action. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009).

The only dispute is whether Gulliford's request for leave for his heart transplant was the but-for cause of his termination. The question is whether Gulliford would have been terminated if he had not taken FMLA leave for his heart transplant and everything else remained the same. Gulliford offers no evidence of a direct admission of retaliatory motive. Nor has Gulliford shown by a preponderance of the evidence that STS terminated his employment because he requested the accommodation of leave for his open heart surgery. In other words, Gulliford has not shown by a preponderance of the evidence that STS would not have eliminated the Tax Department, and with it his job, if he had not taken leave for his heart transplant. Rather, STS eliminated the tax department, and with it Gulliford's job, as part of its reorganization of the business' tax functions.

In making this finding, the Court considers each of Gulliford's causation arguments in turn.

First, Gulliford argues that the timing of his termination is suspicious because he requested the reasonable accommodation of FMLA leave for his heart transplant in late August 2013, because on October 22, 2013, his doctor released him for full-time work starting November 6, 2013, and his job was terminated on October 28, 2013. This timing alone is not enough to create an inference of retaliatory motive. There is no evidence that Wanda Miller received the October 22, 2013 letter before October 28, 2013. Thomas Schilli had been contemplating the elimination of the Tax Department in early 2013, well before Gulliford requested FMLA leave August 2013. Schilli executed the decision to terminate Gulliford after he himself was released from the hospital after Labor Day 2013 and while Gulliford was on FMLA leave and recovering from surgery. This is consistent with the testimony of Wanda Miller. Miller testified that she learned of the decision two

to three months before the October 28, 2013 letter terminating Gulliford's employment. Nor, does the Court find that the timing combined with the other facts Gulliford raises creates an inference of retaliatory motive.

Second, Gulliford asserts that the reasons given for his termination in the October 28, 2013 letter were a lie. The letter states that the functions of the Tax Department were being outsourced to Somerset. Kevin O'Connell of Somerset said that Somerset does corporate filings and not in-house tax work. Indeed, both before and after Gulliford's termination, Kemper and Fellmy's departments did the in-house clerical compliance tax work that had previously been done by the clerical employees that had previously worked for Gulliford in the Tax Department. Thomas Schilli testified that STS still did the tax work in-house. Jason Fellmy did the year-end tax reports that Gulliford previously completed. However, Kevin O'Connell took over the tax planning functions, which were performed by Gulliford. Although the clerical, in-house functions were not transferred to Somerset, the advisory and tax planning functions performed by Gulliford were. O'Connell also testified that for 2013 Somerset did income tax work for states other than Indiana; Gulliford previously did income tax work for states other than Indiana.

Gulliford also argues that the reason given in the letter was a lie because of the February 21, 2014 job advertisement for a "Bookkeeper - Tax Preparer." (Pl. Ex. 9). The posting lists the responsibilities of the position as payroll tax filings weekly, monthly, quarterly, annually; sales tax filings; quarterly unemployment tax filings; 940 and 941; annual W2 filing; annual 1099 filings; and sales tax exemptions. (Pl. Ex. 9). Gulliford notes that the job posting asks for an associate degree in accounting or finance with a "bachelor's degree preferred." This February 2014 job posting is not evidence that STS's proffered legitimate business reason was a lie. The testimony of Thomas Schilli, Wanda Miller, and Beth Kemper were that this bookkeeper job was a clerical job. These are the

duties previously performed by clerical staff in the Tax Department that had been transferred to other departments. The posting sought someone with 2-3 years experience in bookkeeping at a pay rate of $12.00-$16.00 per hour, whereas Gulliford was paid over $26.00 per hour and had a bachelor's degree in accounting with decades of experience. The advertised job was not a replacement for Gulliford's job. Also, Stephanie Vanderhere was hired in September 2013 to replace the individual who did the clerical tax functions under the direction of Beth Kemper but who had left.[1] The February 4, 2014 "Finance/Tax" corporate structure of STS lists Stephanie Vanderhere as its "Staff Accountant/Tax Coordinator," working under Beth Kemper, who worked under Thomas Schilli. *See* (Pl. Ex. 10). Venderhere herself left in February 2014. Daniel Vat was hired to replace Vanderhere, with the title of Administrative Assistant to the Business Manager, in April 2014.

Third, in a similar vein, Gulliford asserts that, at trial, through Thomas Schilli's testimony, STS changed its story about the reason for Gulliford's termination. Gulliford notes that, while the October 28, 2013 termination letter provides that Gulliford's job was being outsourced, Thomas Schilli testified that Gulliford was not cooperating with others while on medical leave because he worked a weekend without a formal medical release. Gulliford also notes that Lou Wilkinson, a vice president of STS, testified that Gulliford was a good performer and wrote a favorable reference letter for Gulliford. Gulliford contends that he was cleared to work part-time by his physician and that the work he was doing was for the benefit of STS by gathering tax documents to assist O'Connell at Somerset. And, Gulliford notes that the termination letter does not indicate performance issues but rather affirms his value.

---

[1] Gulliford incorrectly asserts in his brief that STS hired Stephanie Vanderhere "subsequent to . . . Gulliford's termination." (Pl. Br. 6).

However, Thomas Schilli did not testify that Gulliford was not satisfactorily performing his job functions in relation to his tax responsibilities. In fact, STS hired Gulliford to do contract work on several occasions after his termination. Although the October 28, 2013 letter does not contain all of the reasons and events described in Schilli's testimony, the letter and the testimony are not inconsistent. Schilli continued to testify at trial that he was considering the closure of the Tax Department earlier in the year. In early 2013, one of the Schilli Companies, Schilli Leasing, Inc., received a notice from the Indiana Department of Revenue of an adverse sales tax audit. To respond to that audit, STS retained Ronald Cox, a CPA. While Cox worked on the audit and spent time at the STS offices, Schilli asked Cox what he thought of the Tax Department, and Cox told him that STS did not need a tax department. Kevin O'Connell also told Schilli that if he transferred the income tax functions to outside accountants, it was unnecessary to have a tax department. Schilli was considering moving the income tax work (for states other than Indiana) to his outside accountants. In the spring of 2013, Cox and Schilli had a tentative agreement regarding the income tax work, which ultimately did not come to fruition because Cox's new partners rejected the deal. Schilli testified that he was constantly reorganizing for efficiency and cost effectiveness. Lou Wilkinson gave similar testimony.

The Court finds that nothing in the record makes the explanation given in the October 28, 2013 letter unworthy of credence. It is supported by the shifting of the Tax Department responsibilities to others in the company who absorbed those responsibilities within the existing corporate structure. Until June 2013, the Tax Department, which Gulliford managed, had one or two employees. The clerical employees prepared fuel tax returns and sales tax returns and paid property taxes, business personal property taxes, federal unemployment taxes, and other types of taxes (but not income taxes). Both Ronald Cox and Kevin O'Connell, who are CPAs, described this as "in-

house compliance work" that can be performed by a company's clerical staff. In Spring 2013, the Tax Department consisted of Gulliford and Rachel Harrigan, with Harrigan performing the clerical functions. Harrigan left in June 2013 for another company. STS did not replace her. Harrigan's clerical duties moved to other existing employees in the departments run by Beth Kemper and Jason Fellmy. Gulliford did not perform this clerical work. Gulliford prepared state income tax returns for states other than Indiana and did tax planning and tax analysis.

In May 2013, Thomas Schilli learned he would be having major surgery in July 2013. He put off the decision to close the Tax Department until after his surgery, the recovery for which was prolonged because of complications. During Schilli's recovery, Gulliford learned that a heart was available for him to have a heart transplant and he went on FMLA leave to have the heart transplant. Wanda Miller testified that Schilli mentioned to her two to three months before October 2013 that he was intending to close the Tax Department. This was well before Gulliford worked the weekend of October 5-6, 2013. Thus, the decision to close the Tax Department was not motivated by Gulliford working that weekend.

For all these reasons, the Court finds that this is not an instance of an employer's shifting explanations that may suggest an impermissible motivation for the adverse employment action. *Brunker v. Schwan's Home Serv.*, 583 F.3d 1004, 1007 n.1 (7th Cir. 2009) (citing cases, including *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005)).

Fourth, Gulliford asserts that Lou Wilkinson was a similarly situated employee who did not request medical leave as an ADA accommodation and who retained his employment over the years despite changes to the corporate structure. Gulliford asserts that Wilkinson is similarly situated because he worked at STS for many years and he worked in a "cerebral" management position. Whereas Wilkinson had continuous employment through different departments with changing job

functions and titles when the company reorganized over the thirty years of his employment, Gulliford's employment was terminated when his department was eliminated. Gulliford asserts that the relevant and material difference between Wilkinson and himself was that Wilkinson did not request an accommodation under the ADA.

The Court finds that STS's retention of Wilkinson through the restructuring of STS several times over the thirty years that Wilkinson worked for STS is not evidence of discriminatory animus in relation to Gulliford's termination. The nature of their jobs was sufficiently different that Wilkinson is not a proper comparator. Gulliford's job responsibilities and those of the Tax Department were absorbed by others in the company or were outsourced. Schilli made a business decision to close the Tax Department. In contrast, Wilkinson designed and maintained the company's computer software. No evidence was offered at trial that anyone else in the company could perform Wilkinson's job, that his job or department had become obsolete, or that his job was outsourced. Thus, Wilkinson was not a similarly situated employee.

Fifth, Gulliford asserts that Thomas Schilli's discriminatory motive can be inferred from a discussion with Wanda Miller as to the legality of terminating Gulliford's employment while on leave. When Thomas Schilli returned from his own medical leave in September 2013 and while Gulliford was still on leave for his heart transplant, Wanda Miller advised Schilli on the issue of whether an employee on FMLA leave may be legally terminated if the job is eliminated for nondiscriminatory reasons. This discussion was in the context of Schilli closing the Tax Department. Gulliford suggests in his post-trial brief that Schilli called and asked Wanda Miller about the legality of terminating Gulliford's employment and that Schilli's inquiry was not innocuous because it was directed at Gulliford alone. However, the testimony of record is only that Wanda Miller told Schilli about the effects of the law. There is no testimony that Thomas Schilli made the inquiry of Miller.

Even if Schilli had made the inquiry of Miller, an employer's discriminatory motive may not be inferred from an awareness of the employer's legal obligations. *See Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 271 (7th Cir. 1993). Schilli would have been within his legal rights to ensure that he was complying with the law when he terminated Gulliford's employment. However, "innocuous evidence of age awareness" can become significant when combined with other evidence of discrimination. (ECF 92, p. 8). Unlike in *Partington*, in which the employer purged the files of terminated employees—files that would have contained evidence most relative to the plaintiff's age discrimination lawsuit, there is no such additional evidence in this case. As discussed above, the reason given for Gulliford's termination was not a lie; the tax advisory portion of his job with the Tax Department was outsourced to Somerset as were the income taxes for states other than Indiana and a few minor functions were redistributed within the company, such as the year-end reports done by Jason Fellmy.

In addition, "[e]mployers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 855-56 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2399 (2016) (citing *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010)). As discussed above, STS decided to redistribute the functions of the Tax Department for purposes of efficiency. STS did not have to maintain the Tax Department simply because Gulliford was on medical leave as an ADA accommodation.

As a final note, in the opening of his brief, Gulliford notes that Thomas Schilli called him his "six million dollar man;" however, Gulliford does not reference the comment elsewhere in his

brief. To the extent Gulliford intends this comment to support a finding of a retaliatory motive by Schilli, the Court finds that it does not. First, the comment is far removed in time from Gulliford's termination in 2013, as Schilli made the comment to Gulliford in 2006 or 2007. Also, the comment has no causal relevance to Gulliford's termination or the closing of the tax department because, at the time he had open heart surgery in August 2013, Gulliford no longer received health insurance through STS but rather was covered by Medicare. In other words, his medical expenses were not born by STS during the relevant time period.

Based on the foregoing, the Court finds that Gulliford has not proven by a preponderance of the evidence that his request for the accommodation of medical leave for his heart transplant was the but-for causation of his termination.

Moreover, the Court finds that STS has proven by a preponderance of the evidence that it had a legitimate business reason for terminating Gulliford's employment, namely the elimination of the Tax Department. The Seventh Circuit Court of Appeals "adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Little v. Ill. Dep't of Rev.*, 369 F.3d 1007, 1012 (7th Cir. 2004). The Seventh Circuit Court of Appeals has repeatedly warned that courts "do not sit as a superpersonnel department that will second guess an employer's business decision." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Thomas Schilli testified that he closed the Tax Department because he felt his companies would have better information and better results in managing taxes, tax flow, and tax preparation. Instead, Kevin O'Connell from Somerset visits once a month to plan the tax strategy with Thomas Schilli and the managers. As discussed above, Schilli had been considering eliminating the Tax Department

since early in 2013, well before Gulliford took medical leave for his heart transplant. The evidence offered at trial demonstrates that Schilli believed it was not necessary to maintain the Tax Department or Gulliford's employment. To attempt to show that the reason given was pretextual, Gulliford notes that he was hired by STS to do contract work after his termination in 2014. But there is no evidence that STS or Schilli terminated Gulliford because he was not qualified to do the tax work. Nor does the elimination of the Tax Department as a business decision make the need for future assistance unreasonable or suspicious. The October 28, 2013 termination letter indicated that he may be given project work.[2] STS had a legitimate business reason for eliminating the Tax Department.

## CONCLUSION

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that Plaintiff Gordon Gulliford, Sr. take nothing by his Complaint and judgment is entered in favor of Defendant Schilli Transportation Services, Inc. on Plaintiff's ADA retaliation claim. Pursuant to Federal Rule of Civil Procedure 54(b), the Clerk of Court is **DIRECTED** to enter final judgment on Plaintiff's ADA retaliation claim.

So ORDERED this 27th day of April, 2017.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

---

[2] In this context, Gulliford makes an argument regarding retaliation in relation to the consulting work he did for STS in 2014 and his EEOC charge of discrimination on April 28, 2014. The Court granted summary judgment in favor of STS on his claim of ADA retaliation based on the filing of his EEOC charge. *See* (ECF 53). Recognizing that this is no longer a viable claim, Gulliford argues that it is evidence of retaliatory motive. (ECF 92, p. 9). The Court disagrees. Those events took place six months after Gulliford's termination and, thus, are not relevant to Thomas Schilli's motive at the time of the decision to terminate Gulliford's employment.